In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2205

WALLACE BOLDEN, *et al.*,

*Plaintiffs-Appellees*,

*v.*

WALSH CONSTRUCTION COMPANY,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 4104—**Joan Humphrey Lefkow**, *Judge*.

ARGUED JULY 24, 2012—DECIDED AUGUST 8, 2012

Before EASTERBROOK, *Chief Judge*, and POSNER and FLAUM, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Walsh Construction Company is one of the nation's largest builders, erecting skyscrapers and paving roads, among other projects. Walsh has a central organization of permanent employees, including superintendents dispatched to manage particular projects. These superintendents have discretion over hiring and pay of the hourly workers who do most

of the tasks on-site. The central organization has a few policies, including rules against racial discrimination (with annual training in how to detect and prevent it), and a requirement that superintendents honor collective bargaining agreements, but for most other subjects the superintendents are in charge. This is the norm in the construction business, where the availability of labor and the tasks to be performed change frequently, making flexibility essential. When one phase of a project is completed, Walsh needs journeymen in different trades to handle the next phase. The superintendent and foremen also must mesh the tasks assigned to Walsh's workers with those handled by subcontractors.

The 12 plaintiffs worked for Walsh Construction in 2002 and earlier; none has worked for it since mid-2002. Plaintiffs filed suit against Walsh Group, which they described as "doing business as Walsh Construction Co." That's not accurate; the record does not imply that Walsh Group, a holding company, and its subsidiaries, including Walsh Construction, have failed to observe corporate formalities. See *United States v. Bestfoods*, 524 U.S. 51 (1998). Everyone has treated the suit as one directly against Walsh Construction Co., and we have reformed the caption accordingly.

Plaintiffs contend that Walsh's superintendents practiced, or tolerated, two kinds of racial discrimination: in assigning overtime work, and in working conditions. Plaintiffs submitted a statistical analysis to the effect that white and Hispanic workers were more likely to work overtime hours than black workers did. Plaintiffs

also contended that some superintendents and foremen, at some of Walsh's projects, used demeaning words such as "nigger" or "coon" to refer to black workers, or failed to prevent journeymen from doing so. Derogatory graffiti appeared in portable toilets, and several plaintiffs said that hangman's nooses had been placed in toilets or break sheds. Walsh says that these were the work of subcontractors' employees, and that its supervisors painted over the graffiti and removed the nooses as they learned about them, but that potential defense on the merits is premature at this phase of the litigation.

Walsh observed that its many sites had different superintendents whose practices (and tolerance for the racism of others) differed. Plaintiffs nonetheless asked the district judge to certify the suit as a class action covering all of Walsh's 262 projects in the Chicago area since mid-2001. The district court granted this request and certified two classes. 2012 U.S. Dist. LEXIS 44352 (N.D. Ill. Mar. 30, 2012). One includes "[a]ll blacks employed by Walsh on its construction sites in the Chicago Metropolitan area during the time period June 1, 2001, through the present." The parties refer to this as the hostile-work-environment class. The other includes: "All blacks employed as journeymen by Walsh in the Chicago Metropolitan area at any time during the period June 1, 2001, through the present, who were denied opportunities to work, not afforded overtime hours or not afforded premium pay hours, because of their race." The parties refer to this as the overtime class. Walsh sought to appeal the certification

order under Fed. R. Civ. P. 23(f), and a motions panel granted the request.

There are multiple problems with these class definitions. One is that these 12 plaintiffs can't represent either class, since none of the 12 has worked for Walsh after 2002, even though the classes extend into the indefinite future. The EEOC took a long time to issue right-to-sue letters, so the suit is timely, but the dates of plaintiffs' employment affect how a class should be defined. Federal courts used to certify what were called across-the-board classes, in which one worker who had experienced *any* discriminatory practice could represent a class of all employees who had experienced different kinds of discrimination. But *General Telephone Co. v. Falcon*, 457 U.S. 147 (1982), held that across-the-board classes are incompatible with Fed. R. Civ. P. 23. Given the employment history of these plaintiffs, the class definition should not have extended past 2002. A second problem is that the overtime class defines its members as persons who did not earn more "because of their race." Using a future decision on the merits to specify the scope of the class makes it impossible to determine who is in the class until the case ends, and it creates the prospect that, if the employer should prevail on the merits, this would deprive the judgment of preclusive effect: any other former worker could file a new suit, given that the losing "class" lacked any members.

The parties have paid little attention to these problems, perhaps because they are reparable. The first problem could be fixed by adding plaintiffs who have

worked for Walsh more recently (or are working for it today). The second problem could be fixed by changing the language "who were denied opportunities to work, not afforded overtime hours or not afforded premium pay hours, because of their race" to something like "who sought but were denied opportunities to work, overtime hours, or premium pay hours." Then the litigation could determine whether those events occurred because of race.

Walsh directs its fire to something that cannot be fixed: that both classes include workers at all of Walsh's Chicagoland sites since 2001. When the parties contested this matter in the district court, there were 262 such sites; today the number must be higher, because owners continue to hire Walsh to construct new projects. The sites had different superintendents, with different policies. Many superintendents moved to new sites after finishing their projects, but, with the exception of one concrete-pouring crew that stayed together as a unit, superintendents used different groups of foremen at different sites—and many of the allegedly discriminatory practices depended on the foremen, who made most overtime offers, chastised (or failed to chastise) workers who used racially inflammatory language, and so on.

Different sites had materially different working conditions, as most of the plaintiffs conceded in their depositions. They acknowledged that most superintendents they had worked with did not discriminate; their objections concerned a handful of superintendents and fore-

men, principally John Taheny, Robert Kuna, Arthur Crummie, Robert DeBoer, and Jim Gumber. None works for Walsh today. Taheny worked for Walsh only briefly, and plaintiffs' grievances about him concern a single site, which the parties call Skybridge. Gumber was the superintendent during later events at Skybridge, and he may have failed to deal with an inherited problem. Several plaintiffs testified that many sites where they worked were discrimination-free, while others were marked by severe racial hostility. The large number of sites, and the fact that plaintiffs' experiences differ, raise the question whether the classes satisfy Rule 23(a)(2), which says that a class may be certified only if "there are questions of law or fact common to the class". To evaluate plaintiffs' grievances about Walsh, however, a court would need site-specific, perhaps worker-specific, details, and then the individual questions would dominate the common questions (if, indeed, there turned out to be any common questions).

Rule 23(a)(2) is the basis of the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). In *Wal-Mart*, as here, the plaintiffs contended that discretionary acts by local managers (of stores in *Wal-Mart*, of construction sites here) produced discriminatory effects. The Court held that Rule 23(a)(2) blocks certification of such a class, because "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury'". 131 S. Ct. at 2551, quoting from *Falcon*, 457 U.S. at 157. The Court stated that Rule 23(a)(2) requires "a common conten-

tion—for example, the assertion of discriminatory bias on the part of the same supervisor." 131 S. Ct. at 2551. But when multiple managers exercise independent discretion, conditions at different stores (or sites) do not present a common question.

The sort of statistical evidence that plaintiffs present has the same problem as the statistical evidence in *Wal-Mart*: it begs the question. Plaintiffs' expert, Stan V. Smith, assumed that the appropriate unit of analysis is all of Walsh's Chicago-area sites. He did not try to demonstrate that proposition. If Walsh had 25 superintendents, 5 of whom discriminated in awarding overtime, aggregate data would show that black workers did worse than white workers—but that result would not imply that all 25 superintendents behaved similarly, so it would not demonstrate commonality. Smith's analysis has additional problems. For example, he did not attempt to control for variables other than race. Walsh's collective bargaining agreements require it to offer overtime opportunities first to union stewards. If these stewards are more likely to be white than other journeymen, that could explain the data without any need to impute discrimination to Walsh's superintendents. Smith did not attempt to determine the effect of the stewards-first clause. We need not determine whether Smith's study should have been excluded under Fed. R. Evid. 702. It is enough to say that it does not show any common issue that would allow a multi-site class.

Relying on *Falcon*, the Court in *Wal-Mart* explained that a multi-store (or multi-site) class could satisfy

Rule 23(a)(2) if the employer used a procedure or policy that spanned all sites. In *Wal-Mart*, as here, the plaintiffs conceded that the employer has a policy forbidding discrimination but contended that reposing discretion in local managers permitted that policy to be undermined. According to plaintiffs—in *Wal-Mart* and this case alike—local discretion had a disparate impact that justified class treatment. But *Wal-Mart* disagreed, observing that "[t]he whole point of permitting discretionary decisionmaking is to avoid evaluating employees under a common standard." 131 S. Ct. at 2553. It continued: "*allowing discretion* by local supervisors over employment matters … is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices." *Id.* at 2554 (emphasis in original).

Although the Court recognized that discretion might facilitate discrimination, see *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988), it also observed that some managers will take advantage of the opportunity to discriminate while others won't. "[D]emonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." 131 S. Ct. at 2554. This meant, the Court held, that a class including all stores could not be certified. One class per store may be possible; one class per company is not. And that's equally true of Walsh's 262 (or more) sites.

The district court stated that *Wal-Mart* was about the requirement of Rule 23(b)(3)(D) that class litigation be

manageable. 2012 U.S. Dist. LEXIS 44352 at *15–20. As
the district court saw matters, the problem in *Wal-Mart*
was that the class included thousands of stores and
millions of workers, while the classes certified here
include only hundreds of sites and thousands of work-
ers. Yet that's not what the Supreme Court held. *Wal-Mart*
was decided under Rule 23(a)(2). It *could not*
have been about Rule 23(b)(3)(D), because the class had
not been certified under Rule 23(b)(3). The district
court had used Rule 23(b)(2) in an effort to sidestep
the complexities entailed in giving individual notice
to class members and allowing them to opt out. The
Supreme Court found that use of Rule 23(b)(2) to be a
second reversible error. 131 S. Ct. at 2557–61.

When treating *Wal-Mart* as a decision about manage-
ability rather than commonality, the district court relied
on *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith,
Inc.*, 672 F.3d 482 (7th Cir. 2012). Our opinion remarked
that the class in *Wal-Mart* would not have been manage-
able, *id*. at 488, but we did not suggest that this was
the basis of the Court's decision; we just observed that
the class certified there had problems *in addition to*
Rule 23(a)(2), and that company-wide suits that *do*
present common issues therefore may be certified (if
they are manageable, as *Wal-Mart* would not have been).

In *McReynolds* the plaintiffs contested (among other
things) a national policy allowing brokers to form and
distribute commissions within teams. Under that policy,
brokers could decide for themselves whether to form
teams—and, having formed a team, which other brokers

to admit. Plaintiffs contended that this national policy had a disparate impact, because some successful teams refused to admit blacks. We held that a national class could be certified to contest this policy, which was adopted by top management and applied to all of Merrill Lynch's offices throughout the nation. This single national policy was the missing ingredient in *Wal-Mart*. The Court had said that a single policy spanning all sites could be contested in a company-wide class, 131 S. Ct. at 2553, consistent with Rule 23(a)(2), if all other requirements of Rule 23 also were satisfied; we took the Justices at their word.

Plaintiffs contend that *McReynolds* supports their position. It doesn't. Walsh had no relevant company-wide (or Chicago SMSA-wide) policy other than (a) its rule against racial discrimination, and (b) its grant of discretion to superintendents in assigning work and coping with offensive language or bigoted conduct. The first of these policies presents no problem (plaintiffs certainly don't contest it), and the second—the policy of on-site operational discretion—is the precise policy that *Wal-Mart* says cannot be addressed in a company-wide class action. Plaintiffs' brief on appeal contends that Walsh has 14 policies that present common questions,[†] but

---

[†]  Here is a sample (citations omitted):

1)   Policy/Practice of allowing foremen and superintendents to assign work hours and overtime without reference to any objective criteria.

(continued...)

all of these boil down to the policy affording discretion to each site's superintendent—and *Wal-Mart* tells us that local discretion cannot support a company-wide class no matter how cleverly lawyers may try to repackage local variability as uniformity.

What we have said applies to both the overtime class and the hostile-work-environment class. There are other problems with the hostile-work-environment class, which is not compatible with *Falcon* even apart from the fact that none of the plaintiffs has worked at

---

(...continued)

2)  Policy/Practice of allowing foremen and supervisors to make promotion decisions without reference to any objective criteria....

5)  Policy/Practice not to discipline or reprimand superintendents and foreman that engage in discriminatory actions (racial slurs, race-based assignment of work, etc.)

6)  Policy/Practice that journeymen cannot request or challenge whether decisions involving distribution of overtime are being done fairly; rather, the decision of the superintendent or foreman is final and unchallengeable. . . .

9)  No Policy/Practice to investigate claims of race discrimination.

10) No Policy/Practice to discipline superintendents and foreman for race discrimination. . . .

14) No Policy/Practice of analyzing their own employment data to determine whether complaints of racial disparities (as early as 2002) were actually occurring and addressing any such disparities.

Walsh since 2002. The 12 plaintiffs did not experience the working conditions at all 262 sites either individually or collectively, and a given plaintiff's bad experience with one of the five supervisors we have named does not present any question about the conduct of Walsh's many other superintendents and foremen. The hostile-environment class not only fails Rule 23(a)(2) but also is not manageable. It would require at least one trial per site (to ascertain site-specific conditions) and perhaps one trial per week or month per site (because construction crews are constantly changing, and workers on site while concrete was being poured may have encountered working conditions different from those that prevailed when cabinet work was being installed).

*Wal-Mart* observes that it may be possible to contest, in a class action, the effect a single supervisor's conduct has on many employees. 131 S. Ct. at 2551. Our plaintiffs have not proposed the certification of superintendent-specific classes. Many single-site or single-superintendent classes would flunk Rule 23(a)(1), which provides that a class action may be certified only if "the class is so numerous that joinder of all members is impracticable"; the travelling concrete-pouring crew, for example, had between 7 and 15 members from 2000 to 2002. A class that small won't fly—but all three black members of the crew (through 2002) are plaintiffs and may pursue their claims against Walsh individually. Some of the sites, including Skybridge, had enough workers that the numerosity requirement could be met. Plaintiffs may choose to propose site- or superintendent-

specific classes, which the district court may certify if all requirements of Rule 23(a) and Rule 23(b)(3) are met. But we urge the parties and the judge to act with dispatch. It has been a decade since any of the plaintiffs worked for Walsh, and the case is six years old. It should not be allowed to gather moss.

The order certifying two multi-site classes is reversed.