In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3018

MARISELI GOMEZ BELL,

*Plaintiff-Appellee,*

*v.*

PNC BANK, NATIONAL ASSOCIATION,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-C-1274 — **Thomas M. Durkin**, *Judge.*

ARGUED MARCH 31, 2015 — DECIDED AUGUST 31, 2015

Before KANNE and ROVNER, *Circuit Judges*, and SPRINGMANN, *District Judge.*[*]

ROVNER, *Circuit Judge.* Mariseli Gomez Bell alleged that her former employer, PNC Bank, failed to pay her overtime

[*]The Honorable Theresa L. Springmann, of the Northern District of Indiana, sitting by designation.

wages in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201–262, the Illinois Minimum Wage Law, 820 ILCS 105/1-105/15 and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1-115/15. Bell claims that the failure was not an isolated incident, but rather part of a policy or practice of PNC that affected many other employees. Consequently she successfully moved the district court to certify a class of plaintiffs. We affirm.

## I.

The district court set forth an extensive and thorough recitation of the facts in this case, from which we borrow liberally. Bell worked as a senior banker at the PNC branch at Broadway and Berwyn Streets in Chicago from June 1, 2009, through May 31, 2011. Bell submitted an affidavit from which the district court extracted facts about her knowledge of PNC's overtime policies and practices. R. 65, apx.1–7. In her affidavit, Bell states that she was evaluated, in part, on the basis of how many new accounts she brought into the bank, and in order to generate new accounts she needed to spend "significant" time outside of her regular work hours visiting prospective clients. Some of the assignments to visit prospective clients came from Greg Bolden, a PNC vice president who did not work at the Broadway and Berwyn branch. The overtime work was necessary, she asserted, because the branch was understaffed and could not spare her absence, including, at times, during her lunch breaks.

According to Bell, when she submitted time cards reflecting overtime work, her branch manager, Letticia Flores, rejected the time cards and told Bell that PNC "would not

permit the overtime." R. 65, apx.3.[1] Flores also submitted an affidavit describing her personal knowledge of PNC's over-time policies and practices. Flores is now deceased and can-not be cross-examined, but in her affidavit, Flores states that her supervisor, Christina Romis, a PNC regional manager, told her that "PNC would not permit [Flores] to report over-time for the branch," and "PNC expected its employees to handle their outside-the-branch work on their own time, without reporting any extra hours that they worked." *Id.*, apx.10. Bell also averred that Romis told her that PNC "would not permit overtime to be reported by employees." *Id.*, apx.3. PNC, however, has always had written policies prohibiting off-the-clock work and requiring payment for overtime hours.

In January 2011, Margaret Alvarez, an Employee Rela-tions Investigator for PNC, contacted Bell to ask whether she had ever worked unpaid overtime hours, and Bell confirmed that she had. According to Bell, Alvarez told her that PNC "would not pay for hours that [Bell] could not support with documents." *Id.*, apx.4. On July 31, 2011, after Bell had re-signed from PNC, she received an electronic deposit in her checking account for $1,392.89. Later, Bell learned through communications related to this litigation, that through this payment PNC intended to compensate her for 68.15 unpaid overtime hours. Bell believes that this payment is insufficient

---

[1] Citations are to the record cites from the district court. Due to various anomalies in the electronic docketing system and procedures regarding the unsealing of documents in this court, (*see* Seventh Circuit Operating Procedure 10(b)), the record does not appear in one location on our docket. Instead it appears at R. 11, 12, 13 and 20 in our docket. To avoid confusion, therefore, we cite to the district court record.

to compensate her for the actual number of overtime hours she worked for PNC in 2009 and 2010.

In addition to Bell's and Flores' affidavits, the district court considered PNC's own investigation reports documenting complaints of unpaid overtime. The reports show that in addition to Bell, two other employees at the same branch complained that they were not paid for overtime hours that they worked. One employee, Ernest Ward, claimed that he was not paid for 45.61 hours of overtime and that he was discouraged from submitting overtime records. PNC's investigation into Ward's claims revealed that Flores did not want employees at her bank working overtime and, instead, offered Ward permission to leave work early on another day as compensation. R. 66, apx.276–77. After the investigation, PNC paid Ward for 50.18 hours of overtime.

According to the PNC investigator, on July 3, 2013, PNC began to investigate whether Ward "enable[d] branch employees to falsify bank referral reports." R. 73–1, pp.6–7. The next day, Ward filed a lawsuit against PNC for failure to pay overtime wages. *See Ward v. PNC Bank, N.A.*, No. 13 C 95 (N.D. Ill., dismissed Sept. 25, 2014). PNC fired Ward on February 14, 2013.

PNC's investigation reports also show that another employee at Bell's branch, Tess Claveria, claimed that Flores refused to allow overtime claims and instead directed Claveria to leave work early on a later day in an attempt to compensate Claveria for the overtime hours. Claveria also claimed that she was deprived of her full lunch hour on certain occasions. Claveria sought compensation for overtime hours, and PNC determined that it only owed her payment for 8.02 overtime hours. Alvarez stated that PNC's analysis

of teller electronic journals, alarm codes, log-in and log-out reports, and payroll reports for the dates Claveria reported unpaid overtime or missed meal periods showed that Claveria provided inconsistent statements about the time she worked. On December 26, 2012, PNC began to investigate claims that Claveria "entered false information that enabled her to receive credit for unearned referrals and/or unearned incentive pay." R. 73–1, p.6. Claveria opted into this lawsuit on January 23, 2013, and PNC fired her on February 14, 2013.

PNC eventually fired branch manager Flores as a result of its investigations into allegations of unpaid overtime. Bell testified that after Flores was fired, her new "manager [told Bell] that if [Bell] was working overtime to go ahead and report it." R. 65, apx.53 (145:17–23).

PNC produced all of its internal investigation reports detailing any direct or indirect complaints of unpaid overtime in Illinois for the relevant time period. The reports disclose that nearly ninety percent of PNC's Illinois branches have never had any complaints about unpaid overtime. They also show that some employees at other branches complained to PNC Employee Relations that they worked overtime hours for which they were not paid. PNC produced a table compiling these complaints and listing any overtime compensation PNC paid as a result of its internal investigations. R. 65, apx.153–58. Bell's counsel compared PNC's table to the investigation reports themselves and created a list of complaints found in the investigation reports that were not included in PNC's table, and a list of employees who worked overtime but were not paid. R. 65, apx.159–161. The district court reviewed PNC's table, Bell's counsel's list, and the in-

vestigation reports themselves and created a summary compilation of what the evidence revealed regarding complaints of unpaid overtime made by employees at each branch included in the class Bell seeks to certify. The district court compiled the following facts:

• At the **Algonquin** branch, an employee alleged that he was not paid when he arrived early to work or when he traveled to customer locations to pass out flyers. R. 66, apx.302, apx.308–09. The employee also stated, however, that the branch manager had never told him not to record overtime. *Id.* p. apx.308. Other employees at the branch stated that the employee purposefully arrived to work early so he could leave early. *Id.* p. apx.309. PNC told the employee he would need to provide documentation for any time for which he had not been paid, and the employee agreed that he would provide this if he could. *Id.*, apx.302. The employee was fired for other misconduct unrelated to recording time, *id.* at apx.301–03, and the employee never requested payment for unpaid hours.

• At a **Bloomington** branch on Market Street & JC Parkway, an employee alleged that the branch manager planned to shift overtime hours to the following week to avoid paying overtime rates. R. 66, apx.314. PNC contacted the manager, and he denied having said that he intended to shift hours in this manner and promised to clarify with the branch staff that overtime hours would not be shifted. *Id.*

• At the **Bolingbrook** branch, a branch manager was informed that two employees had taken home information about new PNC products to study. When an employee noted that employees should receive overtime pay for such work, the branch manager said, "Bolingbrook does not have this

issue." R. 66, apx.319–20. The manager was disciplined. *Id.*, apx.321. The two employees did not request overtime pay, but PNC paid each of them an hour of overtime. R. 65, apx.155. Another employee stated that on rare occasions she did not record that she left work ten minutes late. R. 66, apx.328. PNC's records do not reflect that this employee requested overtime compensation for this time or that PNC paid her any such compensation.

• At the **Buffalo Grove** branch, several employees reported that the branch manager told employees that "PNC does not allow overtime and overtime would only be paid to employees who were deserving of it." R. 66, apx.364. The manager also told employees to take extra paid vacation rather than paying overtime. *Id.* PNC investigated the manager, R. 66, apx.362, and paid seven employees a total of 148.45 hours of overtime. R. 65, apx.154.

• At the **Carpentersville** branch, an employee initially alleged that she had been denied a lunch break. The investigation revealed that the employee had formerly been allowed to take her lunch break late in the afternoon so she could pick up her son, but had been told she could no longer do this because it violated PNC policy. The employee confirmed that she was fully compensated for her lunch break and was not owed additional pay. R. 66, apx.418.

• At a **Chicago branch at 18th & Clark,** an employee reported that her practice was to enter all of her time for the week at the beginning of the week and then adjust for any differences that occurred as the week progressed. R. 66, apx.424. She reported that on some occasions she worked past the time she had initially recorded but failed to adjust the time. *Id.* The employee stated that her branch manager

never advised her not to record all the time she worked. *Id.,* apx.424–25. PNC investigated whether the employee was owed any additional pay and determined that she was not. R. 65, apx.154.

• At a **Chicago branch at 35th & State,** an employee alleged that she worked through lunch breaks, but she also stated that she always recorded the time she worked, and she did not allege that PNC had failed to pay her overtime she was owed. R. 66, apx.438. PNC's investigation revealed that the branch manager thought the employee was exempt from overtime pay, and the manager was issued a warning for this mistake. *Id.*

• At a **Chicago branch at 87th & Cottage Grove,** an employee reported that the branch manager "made [the employee] feel as though she was not allowed to enter overtime on her time card," but "never specifically directed her not to enter overtime." R. 66, apx.475. PNC fired the manager due to "extensive discrepancies in the time [the employee] entered as compared to the time she was logged into her computer" over a three-month period, and the manager was "ultimately responsible" for errant time reporting. *Id.* PNC paid the employee for 251.6 hours of overtime as a result of its investigation. R. 65, apx.154. PNC's investigator's notes also show that another employee alleged that her lunch breaks were frequently interrupted due to inadequate staffing. R. 66, apx.487. PNC's records do not reflect that this employee's allegations were addressed.

• At a **Chicago branch at LaSalle & Kinzie,** the assistant branch manager reported that some employees had not reported overtime because "they may have been told there was 'no overtime.' " R. 67, apx.545. One employee reported

that he did not always record his overtime because "he did not want the branch to incur overtime." *Id.* Both employees stated that the branch manager communicated the importance of recording their time accurately, and no one had ever told them to enter time inaccurately. *Id.* Another employee consistently worked overtime and failed to record it, despite the manager telling the employee not to stay late and to accurately record his time if he did stay late. *Id.*, apx.540. Alvarez states that this employee was paid for all hours worked. R. 73–1, p.7 (ID#1036), but PNC's list of overtime paid does not show that the employee was paid. R. 65, apx.154.

• At a **Chicago branch in Lincoln Park,** an employee admitted that she sometimes interrupted her lunch break to assist customers. She did not allege that she was owed unpaid overtime or that her supervisor required her to interrupt her lunch break. R. 67, apx.557.

• At a **Chicago branch at Madison & Leavitt,** an employee admitted that he sometimes interrupted his lunch break to assist customers and would take additional lunch break time to compensate. He did not allege that he was owed unpaid overtime or that his supervisor required him to interrupt his lunch break. R. 67, apx.564.

• At a **Chicago branch at North & Homan,** several employees stated that the branch manager had interrupted their lunch breaks. R. 67, apx.570–71. The manager was disciplined with a verbal warning. *Id.* at apx.571. None of the employees sought payment for unpaid off-the-clock hours, and PNC did not pay for any. R. 65, apx.157.

• At a **Chicago branch at State & Huron,** an employee alleged that he had not been paid for work he did at home. R. 67, apx.577. The employee was advised that he was not permitted to work at home without approval of his manager. *Id.* The employee was paid for 0.30 hours of overtime. R. 65, apx.154.

• Bell cites hand written notes of PNC investigators and alleges that these notes show that in 2009 at the **Downers Grove** branch on 75th Street, "employees reported that management refused to permit employees to record time for work performed before the bank opened," R. 64, p.5 (citing R. 67, apx.583–84, apx.588, apx.593), and that "[e]mployees were not paid for pre-shift work." R. 64, p.7 (citing R. 67, apx.583–85). The district court, however, could not decipher the hand-written notes. Alvarez stated that the investigation at the Downers Grove branch did not involve an allegation of unpaid overtime, but rather allegations that employees were arriving to work late but recording their time as if they had arrived on time. R. 73–9, pp.8–9 (ID#1096-97). The district court noted that Alvarez did not cite any documents in the record to support these statements, nor did she explain why she would have personal knowledge of the investigation at the Downers Grove branch.

• At the **Elgin** branch, an employee stated that "there used to be a rumor that the policy was if you had an outage and you did not find it you did not get paid for the time you took to look for the outage." R. 67, apx.599. The employee described this as an "unofficial rule." *Id.* The employee, however, also stated that he had recently attended a meeting at which a person from the PNC legal department explained that all overtime was to be paid. *Id.* The employee also stated

that he has always been paid overtime, despite the rumor of an unofficial policy. Another employee initially alleged that she thought the branch manager told her not to record overtime, but that she missed a meeting at which the manager instructed the employees to record all overtime accurately. *Id.*, apx.599–600. The employee initially thought she was owed 200 hours of overtime pay but later clarified that she was owed less than $200 of overtime pay. *Id.*, apx.600. The employee agreed that she was in fact owed 3.45 hours of overtime, *id.,* and PNC paid this. R. 65, apx.154.

• At the **Fox Lake** branch, an anonymous employee reported that the branch manager required employees to report to work five minutes early and not record that time. R. 67, apx.612–13. PNC investigators spoke with two other employees at the branch and they said that the manager had never given such an instruction. *Id.* No employees requested payment for unpaid overtime, and PNC did not pay for any. R. 65, apx.154.

• At the **Loves Park** branch, several employees reported that a former branch manager instructed them not to record overtime, but that their current manager instructed them to report any overtime they worked. R. 67, apx.623. Alvarez stated that the Employee Relations department repeatedly asked the employees to report any overtime they were owed, but the employees failed to do so. R. 73–1 ¶ 46.

• At the **North Aurora** branch, employees reported that the branch manager required them to arrive at work five minutes prior to the start of their shifts but not record these five minute periods. R. 67, apx.652–53. The manager was fired, *id.* at apx.653, and seven employees were each paid between 1.75 and 2.75 hours of overtime. R. 65, apx.155.

• At the **Orland Park West** branch, an employee was suspected of under-reporting her time. R. 67, apx.670. The employee admitted that she under-reported her time to hide her inability to work efficiently. *Id.*, apx.670–71. PNC paid the employee 1.25 hours of overtime. R. 65, apx.155.

• At the **Park Ridge** branch, an employee reported a single instance of her manager telling her to record a lunch break she did not take in order to avoid overtime and allow the employee to take an extra paid break the following week. R. 67, apx.676–77. PNC told the manager this violated PNC policy. *Id.*, apx.677. The employee did not request payment for unpaid overtime, and PNC did not pay for any. R. 65, apx.157.

• At a **Rockford** branch on Riverside Boulevard, an employee reported that the branch manager "requested" that employees take extra time off rather than report overtime. R. 67, apx.702. PNC investigators spoke with three employees at the branch and all three said they had never been instructed not to report overtime. One employee skipped lunches without the manager's knowledge, and PNC paid that employee 2.75 hours of overtime. R. 65, apx.154. Another employee alleged that the manager had asked him to complete reports at home without overtime pay, but the employee indicated that he refused to do so. R. 67, apx.693.

• At the **Schaumburg** branch, in the course of a separate investigation, PNC learned that an employee had interrupted her lunch on several occasions to assist customers. R. 67, apx.714. PNC paid the employee 1 hour of overtime. R. 65, apx.155. Another employee stated that he also sometimes interrupted his lunch break to assist customers, but the employee stated that he would always complete his lunch break

at some point during the day. R. 67, apx.714. Both employees stated that the decision to interrupt their lunch breaks was their own. *Id.*

• At the **West Aurora** branch, during a review of the branch's records, the PNC Employee Relations investigator noticed that an employee had worked every day from March 7, 2011, through March 18, 2011. R. 67, apx.726. The employee stated that "she thinks nothing of it if she comes into the branch to help out for a few minutes, and that she does not expect to get paid." *Id.* at apx.725. The manager advised the employee that she must record all her time. *Id.* PNC's investigation report notes that the employee would be paid overtime for the unreported time, R. 67, apx.725, but PNC's list of overtime payments contains no record that the employee was paid. R. 65, apx.156.

• At the **Wheaton–Danada** branch, two employees reported that the branch manager "reacted in a negative manner when they entered overtime on their time sheets." R. 67, apx.738. Both employees also reported that "they had inaccurately recorded their time on a number of occasions in order to make it appear as though they had only worked 40 hours per week." *Id.* at apx.731. After an investigation into the amount of overtime pay PNC owed the two employees, PNC paid one employee for 39 hours of overtime and 27 additional hours of regular pay, and the other employee for 1.6 hours of overtime and 1.6 additional hours of regular pay. R. 65, apx.154.

In addition to the incidents recorded in PNC's investigation reports, Bell submitted an affidavit from James Cobb, a manager of PNC's DePaul branches, in which he states that he had borrowed "more than 37[PNC] employees … from

branches all over the Chicago region" to staff "table days," which are PNC promotional events. R. 65, apx.14. Cobb attached to his affidavit a list of 37 employees he says he "borrowed." R. 65, apx.15. Cobb learned that his spouse, Ernest Ward (who as the Court has already noted, filed a related suit against PNC), had worked for him during a table day but had not recorded this time on his time card at the Broadway and Berwyn branch where Ward worked. Cobb expressed concern to a PNC Employee Relations representative that he did not know whether the thirty-seven employees had been paid for their overtime through their branch offices. Cobb claimed that he was told to ignore the issue and that PNC would not investigate. Alvarez, on the other hand, testified that she talked to PNC payroll personnel who told her that all thirty-seven of the employees in question had been properly paid. Alvarez did not provide business records to support this assertion. And, at least according to Cobb's affidavit, Ernest Ward was not paid for his overtime.

PNC contends that it has a written overtime policy that explicitly requires payment of time and a half for any time worked over forty hours in any work week. It contends that pursuant to this policy, it "has paid overtime at every branch in the putative class every year during the class period." R. 72, p.6. Specifically, according to Alvarez, "PNC has paid overtime to non-exempt branch employees at every branch in the putative class during each year from 2009 to October 2013 for a total of $432,290.85 for approximately 17,673 hours of overtime." R. 73–1, p.4, (ID#1031). Alvarez, however, did not submit or reference any business records to the district court to support this assertion nor did she explain how she had personal knowledge of those facts. The district court, therefore, did not consider those assertions. This may have

been an incorrect conclusion, as evidence given by affidavit could suffice to resolve disputes before deciding whether to certify a class. *See Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (For class certification purposes, a judge need not accept the plaintiff's assertion that she met the requirements of Rule 23 as conclusive; instead "the judge would receive evidence (if only by affidavit) and resolve the disputes before deciding whether to certify the class."). On the other hand, an affidavit must be based on personal knowledge. Fed. R. Civ. P. 56(c)(4); *Cocroft v. HSBC Bank USA, N.A.*, No. 14-1460, 2015 WL 4597537, at *4 (7th Cir. July 31, 2015). As we discuss in a moment, the burden is on the proposed plaintiff class to prove eligibility for class certification, and so the importance of the affidavit may not be significant. If the district court finds it necessary, it can explore the issue further upon remand.

The district court also noted that even if PNC had business records to support Alvarez's statements that PNC paid all of the overtime due, those records would not negate the evidence in the record that PNC's management had denied compensation for overtime work on a number of occasions. The district court found that the evidence showed that PNC often paid overtime only after initially failing to do so. It then noted that if PNC willfully failed to pay overtime, PNC would be liable not merely for actual overtime wages, but also for additional damages under both Illinois law and the Fair Labor Standards Act. *See* 820 ILCS 105/12; 29 U.S.C. §§216, 260.

Despite PNC's alleged written policy and the evidence that PNC has paid some overtime and disciplined branch managers who had prevented employees from properly re-

cording overtime, Bell contends that the evidence in the rec-
ord demonstrates that PNC has an unofficial policy of fre-
quently denying proper compensation to its non-exempt
employees who have worked overtime. In the district court
Bell argued that this evidence constituted a sufficient basis to
certify a class that the plaintiff proposed as follows (in rele-
vant part):

> All people residing in Illinois who:
>
> (a) Were employed by PNC Bank (or any of its
> predecessors) on a full-time basis at any point
> during the Class Period;
>
> (b) Were classified by PNC Bank as non-
> exempt from the overtime laws; and
>
> (c) Worked in one of the 27 Certified Branches.

R. 63, p.2 (ID#929).

Bell listed 27 branches at which she contended there was
proof of an unofficial policy or practice of denying overtime.
*Id.* at p.2-3 (ID#929-930); Order, p.13.[2]

Bell contended that the class-wide proceedings would re-
solve PNC's liability for the following common questions:

> As a question of fact, did PNC Bank have an
> unofficial policy or practice that required em-
> ployees class-wide to work off-the-clock over-
> time hours (that is, an unofficial policy or prac-

---

[2] Bell initially sought to bring claims on behalf of a putative class of non-
exempt employees of PNC's Illinois retail bank branches. After a year of
discovery, Bell moved under Rule 23 to certify a narrower class of all
non-exempt employees at 27 Illinois branches of PNC.

tice that prohibited employees from reporting overtime hours)?

As a question of fact, did PNC Bank have a policy or practice that PNC Bank investigations would not fairly lead to full pay for employees for overtime work?

As a mixed question of law and fact, were those policies and practices unlawful and harmful to employees in the 27 Illinois branches that are in the class?

As a matter of law, is PNC Bank's written policy on overtime a defense?

As a mixed question of law and fact, has the plaintiff shown that PNC Bank's conduct was willful?

As a mixed question of law and fact, has PNC Bank proven that its conduct was undertaken in good faith?

As a question of fact, did PNC Bank's conduct make it more difficult for class members to calculate the number of off-the-clock hours that they worked?

As a mixed question of law and fact, when calculating overtime pay for class members, does the Fluctuating Workweek doctrine apply?

R. 63, pp. 3–4 (ID#930-931).

In the district court, PNC argued that (1) the class did not meet the requirements of Rule 23(a) requiring numerosity, commonality, typicality and adequacy of representation;

(2) Bell could not demonstrate that common questions of law or fact predominated over individual claims as required by Rule 23(b)(3); (3) the class was insufficiently defined and (4) conditional certification of a collective action under the Fair Labor Standards Act was not warranted.

The district court certified a class of employees from twenty-six PNC branches in Illinois, excluded employees from two proposed branches (the DePaul branch and the Naperville branch) and including, instead, employees from another branch (the Oak Park branch). The district court concluded that whether PNC has an unofficial policy or practice that requires employees to work off-the-clock over-time hours was a question common to the class. The court below also concluded that Bell's proposed class met the re-quirements for numerosity, typicality, and adequacy of rep-resentation, and these conclusions are not contested on ap-peal. Finally, the court concluded that the common issues predominated over any individual questions.

On appeal, PNC asks this court to address only the fol-lowing two issues:

> (1) whether the district court abused its discre-
> tion in certifying a class without requiring the
> plaintiff to prove the existence of an unwritten
> policy to satisfy Rule 23's commonality and
> predominance requirements, and

> (2) Whether the district court abused its discre-
> tion in certifying a class by treating individual-
> ized liability issues as damages issues.

We address each of these in turn, keeping in mind that we review class certification orders for an abuse of discretion

which can occur when a district court commits legal error or makes clearly erroneous factual findings. *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 704 F.3d 489, 498 (7th Cir. 2013). Our review is deferential, but exacting: "A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites" for class certification have been met. *CE Design, Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011). The party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

## II.

We addressed many of these same issues regarding commonality and predominance within the last few weeks in our decision in *Chicago Teachers Union, Local 1 v. Bd. of Ed.*, No. 14-2843, 2015 WL 4667904 (7th Cir. August 7, 2015). We summarize our general explanation of class action requirements here, and refer the reader to that decision for a more nuanced and detailed discussion. *Id.*

Because a class action is an exception to the usual rule that only a named party before the court can have her claims adjudicated, the class representative must be part of the class and possess the same interest and suffer the same injury. *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2550 (2011); *Chicago Teachers Union*, 2015 WL 4667904, at *3. The general gatekeeping function of Federal Rule 23(a) ensures that a class format is an appropriate procedure for adjudicating a particular claim by requiring that the class meet the following requirements:

> (1) the class is so numerous that joinder of all members is impracticable (numerosity);
>
> (2) there are questions of law or fact common to the class (commonality);
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and
>
> (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation).

Fed. R. Civ. P. 23(a) (parentheticals ours).

In addition to meeting these requirements, the class must satisfy one of the four conditions in Rule 23(b). In this case, the plaintiffs sought certification under Rule 23(b)(3), the rule that applies to class actions when the purported class seeks monetary damages. Federal Rule 23(b)(3) allows for class certification when "questions of law or fact common to the class members predominate over any questions affecting individual members" and when a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### A. Commonality

Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily we would begin there and only turn our attention to Rule 23(b) after we were certain that all of Rule 23(a)'s requirements had been met. In this case, however, the question of commonality and predominance overlap in ways that make them difficult to analyze separately; consequently much of our discussion applies to both issues.

*See Chicago Teachers Union*, 2015 WL 4667904, at \*13. Nevertheless, we focus first on teasing out the question of commonality.

Although a court need only find a single common question of law or fact (*Wal-Mart*, 131 S. Ct. at 2556), the mere occurrence of all plaintiffs suffering as a result of a violation of the same provision of law is not enough. *Id.* at 2551; *Chicago Teachers Union*, 2015 WL 4667904, at \*4. *Suchanek v. Strum Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014). The claims must depend upon a common contention that is capable of class-wide resolution. *Wal-Mart*, 131 S. Ct. at 2551; *Chicago Teachers Union*, 2015 WL 4667904, at \*4. In this context, class-wide resolution means that determining the truth or falsity of the common contention will resolve an issue that is central to the validity of each claim. *Wal-Mart*, 131 S. Ct. at 2551. The majority in *Wal-Mart* summed this up by stating:

> What matters to class certification … is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* at 2551 (emphasis in original) (internal citations omitted). In *Wal-Mart*, the Supreme Court emphasized that it was looking for "some glue holding the alleged *reasons* for all those decisions together, … [such] that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id*. at 2552 (emphasis in original).

Bell proposes that the common question is as follows: Did PNC have an unofficial policy or practice that required employees class-wide to work off-the-clock overtime hours? PNC argues that before the district court could properly certify a class based on the unofficial policy theory, Bell was required to actually prove—not merely allege—the existence of such a policy. In this sense, PNC seems to agree that the question posed is common to all parties. After all, commonality is satisfied when "determination of [the] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. Why would the plaintiffs need to prove the truth of their allegation that PNC has an unofficial policy of refusing to pay overtime if it was not central to the validity of each one of the claims? PNC, however, alleges that the answer to this question will not resolve the question "in one stroke," but we disagree for reasons we will explain below when we discuss the issue of predominance. And in fact, in a similar case, this Circuit has already concluded that a proposed class of bank employees maintained a common claim that the bank enforced an unlawful, unwritten policy of denying employees earned overtime compensation and that "[t]his unofficial policy is the common answer that potentially drives the resolution of this litigation." *Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 909 (7th Cir. 2012), *cert. granted, judgment vacated*, 133 S. Ct. 1722 (2013).[3] PNC argues that *Ross* can be

---

[3] On appeal, the Supreme Court granted certiorari, vacated, and remanded the *Ross* decision. *See RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013) ("Judgment vacated, and case remanded to the United States Court of Appeals for the Seventh Circuit for further consideration in light of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)."). The case settled before the Seventh Circuit could address the Supreme Court's order. *See*

distinguished because the "district court weighed the evidence and concluded that the plaintiffs had *proven* the existence of an unofficial policy." PNC Brief, p.24 (emphasis in original). PNC does not cite to a particular page of the *Ross* order to support this contention, and, in fact, the district court's language in *Ross* suggests that the mounting evidence proved not that the bank had the policy, but that the common question would predominate over individual issues:

> The court concludes, however, that the number of people making the same allegations across branches, managers, positions, and time frames *has reached a point from which it may be inferred that the common issue of whether a company-wide policy existed to deny overtime will predominate* over the variations in methods used to accomplish the alleged policy. The complexity of proof is a problem plaintiffs will have to address in presenting their case on the merits but it does not negate predominance of the central, common issue.

---

*Tamas v. Family Video Movie Club, Inc.*, No. 11 C 1024, 2013 WL 4080649, at *6 (N.D. Ill. Aug. 13, 2013). As the district court explained, the Supreme Court's order, however, does not negate the precedential authority or persuasiveness of the holding and reasoning in *Ross*, as orders granting certiorari, vacating, and remanding are not reversals and do not indicate that the lower court's decision was erroneous. *See Order*, pp.19-20, n.7.

*Ross v. RBS Citizens, N.A.*, No. 09-CV-5695, 2010 WL 3980113, at *6 (N.D. Ill. Oct. 8, 2010) (emphasis ours), *affirmed*, 667 F.3d 900 (2012).

We need not spend too much time analyzing whether the district court in *Ross* did or did not come to a conclusion about the merits of the question, because our case law is clear that such proof is not required, only that it "is *capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 818 (7th Cir. 2012).

Cases in which low-level managers use their given discretion to make individual decisions without guidance from an overarching company policy do not satisfy commonality because the evidence varies from plaintiff to plaintiff. *See Wal-Mart*, 131 S. Ct. 2553–55; *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896 (7th Cir. 2012). Bell, on the other hand, has offered evidence that the denial of overtime pay came from a broader company policy and not from the discretionary decisions of individual managers. Bell proffered evidence that she was told not to record overtime. Her branch manager, Letticia Flores submitted an affidavit that stated that PNC regularly required off-the-clock work. And at least one regional manager, Christina Romis, told branch managers not to record overtime worked by their employees. Moreover the court chronicled plentiful evidence suggesting that many employees worked overtime without proper compensation.

We conclude therefore, that the question "Did PNC have an unofficial policy or practice that required employees class-wide to work off-the-clock overtime hours?" is indeed a common one that is capable of class-wide resolution. Our

discussion of predominance that follows will add further fodder to this conclusion.

**B.  Predominance**

Even after a proposed class has met the requirements of Rule 23(a), however, a Rule 23(b)(3) class must also demonstrate that "questions of law or fact common to the class members predominate over any questions affecting individual members." Fed. R. Civ. P. 23(b)(3). (The Rule 23(b)(3) requirement regarding superiority is not at issue in this appeal). The burden is on the plaintiffs to demonstrate, by a preponderance of the evidence, that they have met each requirement of Rule 23. *Messner*, 669 F.3d at 811.

To support its contention that Bell was required to actually prove—not merely allege—the existence of such a policy, PNC cites to the part of the *Wal-Mart* decision that states, that "a party seeking class certification … must be prepared to *prove* that there are in fact sufficiently numerous parties, common questions of law or fact, etc." PNC Brief, p.17, *citing Wal-Mart*, 131 S. Ct. at 2551 (emphasis by PNC).

PNC, however, has conflated two inquiries. A proposed class of plaintiffs must prove the *existence* of a common question, and one that predominates over individual questions, but it need not prove that the answer to that question will be resolved in its favor. On this point, the Supreme Court in *Amgen* could not have been more clear: "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Ct. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1191 (2013). "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case;

rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." *Id.* at 1191; *Chicago Teachers Union*, 2015 WL 4667904, at *14. The Seventh Circuit has been as unequivocally clear as the Supreme Court in *Amgen*, warning that "In conducting this analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *See Messner*, 669 F.3d at 811; *See also Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010); *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009); *Payton v. County of Kane*, 308 F.3d 673, 677 (7th Cir. 2002). In sum, the proposed class must prove compliance with Rule 23, and need not prove the merits of the underlying common question. The very language of the quotations from the Supreme Court and this court upon which the plaintiff relies unequivocally support this notion. The court in *Wal-Mart* stated that, "A party seeking class certification must **affirmatively demonstrate his compliance with the Rule [23]**—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis ours). The language of our decision in *Messner* is the same: "[p]laintiffs bear the burden of showing that a proposed class **satisfies the Rule 23 requirements**. *Messner*, 669 F.3d at 811. (emphasis ours).

Thus, the default rule is that a court may not resolve merits questions at the class certification stage. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Amgen*, 133 S. Ct. at 1194–95. *See also Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398,

2407 (2014) (finding that price impact evidence "does not bear on the question of predominance under Rule 23(b)(3), and is thus appropriately considered only on the merits after the class has been certified."); *Schleicher*, 618 F.3d at 685 (7th Cir. 2010) ("a court may take a peek at the merits before certifying a class, … [but] this peek must be limited to those aspects of the merits that affect the decisions essential under Rule 23.").

This does not mean, however, that on issues affecting class certification, a court must simply assume the truth of the matters as asserted by the plaintiff. If there are material factual disputes that **bear on the requirements for class certification**, the court must "receive evidence if only by affidavit and resolve the disputes before deciding whether to certify the class." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). And so, for example, a judge might need to determine if a class really has 10,000 members as a plaintiff alleges or only 10, as alleged by defendants. *Id.* This is what the *Wal-Mart* court meant when it said that Rule 23 "does not set forth a mere pleading standard." *Wal-Mart*, 131 S. Ct. at 2551. Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements, but they need not make that showing to a degree of absolute certainty. *Messner*, 669 F.3d at 811.

In other words, a court weighing class certification must walk a balance between evaluating evidence to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will ultimately prevail on the merits. The distinction between proving evidence of a common question that predominates and proving evidence of the merits can be

demonstrated by comparing two opinions from this Circuit. In *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003), the plaintiffs proposed a common question as to whether the defendant leaked chemicals in violation of law, and whether those chemicals reached the soil and groundwater beneath the homes of the class members. The plaintiffs in that case presented a theory backed by credible evidence that there was a single source of contamination by a single defendant and the claim was that a container containing harmful chemicals leaked and contaminated the water supply, thus harming the plaintiffs. *Id.* at *911*. The plaintiffs did not prove that the container leaked, nor that the ground water was contaminated, but rather presented sufficient evidence of a theory that was common to the class and predominated over individual issues. *Id.* at 911–12. In contrast, in *Parko*, property owners attempted to certify a class of homeowners who claimed that the groundwater under their homes had been contaminated by chemicals from a particular defendant and its predecessors and subsidiaries. *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1084 (7th Cir. 2014). But unlike in *Mejdrech*, the plaintiffs did not set forth any evidence that any particular defendant was the source of the pollution, that the groundwater was even polluted, that it provided a source of water for the plaintiffs, and that the plaintiffs experienced any diminution in property value. *Id.* at 1085–86. In other words, it was "not even clear that the plaintiffs had *identified* a common issue." *Id.* at 1086 (emphasis in original).

In this case the district court sifted through voluminous evidence that pointed to a common question as to whether PNC had an unwritten practice or policy that required employees class-wide to work off-the-clock overtime hours. In fact, the district court went so far as to lean toward an analy-

sis of the merits stating that "there is evidence in the record to the contrary [of PNC's claim] that supports Bell's contention that PNC has an 'unofficial policy or practice that required employees class-wide to work off-the-clock overtime hours.'" Order, p.17. Bell and Flores both stated that Christina Romis, a PNC regional manager, told them that PNC had a policy against paying for overtime work. R. 65, apx.3, 10. PNC's investigation reports reveal that employees from at least six other branches alleged that their managers told them that PNC had an unofficial policy against compensating overtime work. *See* R. 66, apx.364 (Buffalo Grove); R. 67, apx.599 (Elgin); R. 66, apx.475 (87th & Cottage Grove); R. 67, apx.623 (Loves Park); R. 67, apx.652–53 (North Aurora); R. 67, apx.738, 731 (Wheaton–Danada).

PNC makes a convincing argument that the answer to Bell's alleged common question will not resolve a key issue for all plaintiffs. PNC asserts that if the answer to the question "Does PNC have an unofficial policy of denying overtime pay?" is "no," then over 250 employees at 26 different branches are left with nothing in common and each class member must prove his or her claim individually. As the court noted in *Amgen*, a common question predominates over individual claims if "a failure of proof on the [common question] would end the case" and the whole class "will prevail or fail in unison." *Amgen*, 133 S. Ct. at 1191. And, in the context of commonality, the *Wal-Mart* court stated that a common question is one in which the answer to the question "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 at 2551.

> If, to make a prima facie showing on a given question, the members of a proposed class will

> need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.

*Messner*, 669 F.3d at 815.

PNC argues that if a court determines that PNC does not, in fact, have the alleged unwritten policy, then "resolution of that issue would have no bearing whatsoever on these individual claims." (PNC reply brief, p.12). Each class member who chooses to bring a claim for unpaid overtime, PNC argues, would still be required to prove each element of the off-the-clock claim: that they worked overtime, that their manager knew or had reason to know of the work, and that it caused them to work more than 40 hours in a week.

PNC, however, misunderstands the nature of the proposed class' claim. The class' claim is that they have been denied overtime pay because of an unofficial policy that either prohibited or discouraged PNC employees from seeking overtime pay. If, on the merits, the district court were to determine that there was no such unofficial policy (and indeed it is possible, as we make no contentions about the prospects of victory on the merits, *see Chicago Teachers Union*, 2015 WL 4667904, at *14) then all of the class members' claims would fail in unison. They may have an individual claim that remains, but it would be based on an entirely different legal theory. Instead, the individual claim would be one by individual Employee A alleging that her manager, Manager B, forced her to work off-the-clock without pay.

Thus the class claim that PNC had an unofficial policy that left it liable under the Fair Labor Standards Act and Illinois law would prevail or fail for the class as a whole. "In no event will the individual circumstances of particular class members bear on the inquiry." *Amgen*, 133 S. Ct. at 1191. It makes no difference to the class claim as a whole how many hours of off-the-clock work each employee worked or the intent of the manager. These would be issues for the portion of the suit in which individual damages are assessed—an issue we will discuss below. In other words, "[a] failure of proof on the *common* question … ends the litigation and thus will never cause individual questions of reliance or anything else to overwhelm questions common to the class." *Amgen*, 133 S. Ct. at 1196.

It is true that the alleged violations were eventually "cured" for many employees—in many cases PNC eventually paid employees for overtime work, or disciplined or terminated non-complying managers. But PNC's efforts to cure errors does not resolve all of the questions regarding liability. Even when cured, the evidence could leave a court resolving the case on the merits to resolve whether (a) the efforts to cure were necessary because of a previous unwritten policy, (b) a good faith violation absolved PNC of liability, (3) the violations were willful and thus exposed PNC to greater liability, (4) PNC's written policy is a defense.

The rules for class certification work as well in PNC's favor as they do in Bell's. Class certification "provides a single proceeding in which to determine the merits of the plaintiffs' claims, and therefore protects the defendant from inconsistent adjudications." 5 Moore's Federal Practice §23.02 (1999). If the district court finds that PNC did not have the

alleged unwritten policy, then all of the plaintiffs' claims fail and the class would be decertified.

This is not an unknown process. When the class is decertified, the suit becomes an individual action, leaving the individual plaintiffs to file their claims on their own. *See, e.g.*, *Culver v. City of Milwaukee*, 277 F.3d 908, 913–14 (7th Cir. 2002). Rule 23(e) which requires that notice of a proposed dismissal be given to all members of the class anticipates just such a scenario so that class members know that the statute of limitations, that had been tolled during the pendency of the class action, will begin running again. *Id.* at 914.

## C. Individualized relief

The fact that the plaintiffs might require individualized relief or not share all questions in common does not preclude certification of a class. *Chicago Teachers Union*, 2015 WL 4667904, at *11; I*n re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014) (commonality of damages is not required in class action suit); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (the need for individual proof alone does not necessarily preclude class certification); *Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008); *Allen v. Int'l Truck and Engine Corp.*, 358 F.3d 469, 471–72 (7th Cir. 2004). Rule 23(b) requires only common evidence and common methodology, not common results. *Messner*, 669 F.3d 802. "Neither Rule 23 nor any gloss that decided cases have added to it requires that *every* question be common. It is routine in class actions to have a final phase in which individualized proof must be submitted." *Suchanek*, 764 F.3d at 756. *See also Johnson v. Meriter Health Servs. Employee Ret. Plan*, 702 F.3d 364, 369 (7th Cir. 2012) (In a 23(b)(2) class action, "a declaration is a permissible prelude to a claim for damages.").

If the class prevails in demonstrating that PNC had an unofficial policy or practice that required employees class-wide to work off-the-clock overtime hours, scores of separate trials might be necessary to determine which class members were actually adversely affected by the policy and if they were, what loss each class member sustained. At least it will not be necessary in each of those trials to determine whether PNC had an illegal policy of denying pay for off-the-clock work. This is precisely parallel to our conclusion in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) ("[S]hould the claim of disparate impact prevail in the class-wide proceeding, hundreds of separate trials may be necessary to determine which class members were actually adversely affected by one or both of the practices and if so what loss each class member sustained … But at least it wouldn't be necessary in each of those trials to determine whether the challenged practices were unlawful.") *See also Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 505–06 (7th Cir. 2012) (Rovner, J. *dissenting*) (describing a second step process in class action litigation in which adversarial proceedings were held to determine which potential class members had been harmed by an illegal employment rule).

If the district court finds that PNC has an official policy of denying overtime pay, it is likely that a certain number of class members were not harmed by the policy because they never worked beyond their forty-hour week. This alone does not preclude class certification. Plaintiffs need not prove that every member of the proposed class has been harmed before the class can be certified. *Suchanek*, 764 F.3d at 757. A class will often include persons who have not been injured by the defendant's conduct, but this possibility or, indeed inevita-

bility, does not preclude class certification. *Kohen*, 571 F.3d at 677 (7th Cir. 2009). "If very few members of the class were harmed, that is an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate" the defendant. *Suchanek,* 764 F.3d at 757–58 (internal citations omitted). "If, however, a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Messner*, 669 F.3d at 824. The important distinction then is "between class members who were not harmed and those who could not have been harmed." *Id.* at 825. For example, in this case, managerial employees who are exempt from overtime hour laws could not have been harmed by the policy. Those employees who could have been harmed by the policy, but were, in fact, not harmed, can be excluded during a later determination on the merits.

For example, as described in *Jamie S.*, after this court declared that United Airlines "no married female flight attendant" rule violated Title VII's ban on sex discrimination, any woman who had lost her position because of the rule became entitled to relief. But these class members were difficult to identify. Many had silently resigned their positions in contemplation of the rule rather than formally protesting or waiting for the airline to discharge them, so there was no record as to why any particular female flight attendant left. Consequently, adversarial hearings were held before special masters in order to establish whether each claimant in fact left her position because of the illegal rule. *See Jamie S.,* 668 F.3d at 505–06 (Rovner, J. *dissenting*) (describing facts and processes from *McDonald v. United Air Lines, Inc.,* 587

F.2d 357 (7th Cir. 1978) and *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194 (7th Cir. 1971)).

PNC assumes that Rule 23 requires every class action to resolve all liability issues for every class member. "Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 133 S. Ct. at 1196. And our cases demonstrate that commonality as to every issue is not required for class certification. In *Suchanek*, we determined that the question as to whether coffee packaging misled consumers was common despite the fact that individual consumers saw different packaging and may have been harmed to varying extents or not at all. *Suchanek*, 764 F.3d at 757. In *IKO*, we upheld certification of a class despite the fact that different plaintiffs had different experiences with the sub-standard roofing tiles. *IKO*, 757 F.3d at 601–02. And in *Pella*, we certified a class despite the fact that plaintiffs' experiences with defective Pella windows may have been caused by many individual variances such as specific conditions and installation, noting that the fact that class members still must prove individual issues of causation and damages would not prevent class certification. *Pella Corp.*, 606 F.3d at 394.

It is true that some employees have been made whole as a result of the PNC investigation. It is entirely possible, however, that these employees were still injured and could collect damages beyond their actual wages. Under both Illinois law and the Fair Labor Standards Act, a good faith violation does not absolve the employer of liability. 820 ILCS 105/12; 29 U.S.C. §§216, 260. Nor does an agreement between the employee and the employer to work for less than the re-

quired wage. 820 ILCS 105/12(a). Both Illinois law and the Fair Labor Standards Act distinguish between willful violations and violations made in good faith for purposes of determining the extent of an employer's liability. 820 ILCS 105/12; 29 U.S.C. §§216, 260. Whether or not PNC had an unlawful policy denying required compensation is relevant to whether PNC willfully denied overtime pay to its employees, or whether such denials occurred despite a good faith attempt to comply with the statute. These questions are, in turn, relevant to the extent of damages under Illinois law and the Fair Labor Standards Act. *See* 820 ILCS 105/12; 29 U.S.C. §§216, 260. In short, many issues remain unanswered and the district court was correct to conclude that a class action would be an appropriate and efficient pathway to resolution.

The district court properly considered each of the issues and did not abuse its discretion in certifying the class. The decision of the district court is therefore AFFIRMED.