COURT OF APPEALS
DECISION
DATED AND FILED

January 30, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1268**

STATE OF WISCONSIN

Cir. Ct. No. **2021CV192**

IN COURT OF APPEALS
DISTRICT IV

---

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4,

    PLAINTIFF-RESPONDENT,

  V.

HEATHER R. SELDAL,

    DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed.*

Before Blanchard, Graham, and Taylor, JJ.

¶1 GRAHAM, J. This is the second appeal that stems from Heather Seldal's attempt to certify a class of Wisconsin residents with claims against National Collegiate Student Loan Trust 2007-4 ("the Trust"). Seldal argues that the circuit court erroneously exercised its discretion when it denied her class

certification motion after this case was remanded to the circuit court following the prior appeal. We reject Seldal's arguments and affirm.

## BACKGROUND

¶2 Seldal took out a student loan from PNC Bank in 2007. This appeal concerns what happened to the ownership of the loan after Seldal's transaction with PNC was complete, and more specifically, the parties' dispute over whether the Trust is the entity that currently owns Seldal's loan and has the right to collect on it.

¶3 The Trust was formed for the purpose of offering securities that are backed by student loan assets. As further discussed in detail below, the Trust contends that Seldal's student loan with PNC was bundled with the student loans of hundreds of other PNC borrowers, and that the resulting "pool" of PNC loans was "sold, assigned, and transferred" to the Trust through a two-step transaction. For the most part, Seldal does not take issue with the Trust's description of what occurred in that transaction, but she disputes whether the loans were actually assigned to the Trust, and she further alleges that, even if they were, the Trust cannot prove that fact with admissible evidence.

¶4 At this point, it may be helpful to provide additional detail about the student loan securitization transaction through which the Trust allegedly acquired Seldal's loan. According to the Trust, 18 pools of private student loans, including a PNC pool containing Seldal's loan, were assigned to the Trust in a two-step transaction that occurred on September 20, 2007. The Trust makes the following allegations about this transaction, which Seldal does not meaningfully dispute except as noted below.

2

¶5 In the first step of the transaction, an entity named First Marblehead Corporation ("Marblehead") arranged for more than a dozen banks, including PNC, to assign pools of private student loans held by the respective banks to an intermediary depositor named National Collegiate Funding ("NCF"). All of the loans in these pools had been processed by a single entity called The Education Resource Institute (TERI), and they were assigned to NCF through 18 separate contracts, which are referred to as "pool supplement" agreements.

¶6 Each of the 18 pool supplement agreements is named for the bank that originated the pool of loans (e.g., the "Pool Supplement PNC Bank, N.A."). The individual loans in each pool were not specifically identified in the text of any of the pool supplement agreements. Instead, each of the 18 pool supplement agreements referred to the pool of loans by the name of the originating bank (e.g., the "Transferred PNC Bank Alternative Loans"). According to the Trust, the individual loans that were included in the pools were specifically identified in electronic "schedules" that were made part of the pool supplement agreements. (Here, Seldal appears to acknowledge the existence of the 18 pool supplement agreements, but she disputes the existence and the authenticity of the schedules that allegedly identify the specific loans that were assigned through the pool supplement agreements.)

¶7 In the second step of the transaction, NCF entered into a contract in which it assigned the 18 pool supplements to the Trust. That contract was called the "Deposit and Sale Agreement," and a schedule attached to the agreement identified the names of the 18 pools of loans that were being assigned to the Trust. (At this stage in the litigation, Seldal acknowledges the existence of the Deposit and Sale Agreement, and she does not appear to dispute the existence of its schedule.)

¶8 As it specifically pertains to Seldal's loan, the Trust alleges that Seldal's loan was pooled with other PNC loans and assigned to NCF through a contract called "Pool Supplement PNC Bank, N.A. (hereinafter, the "PNC Pool Supplement Agreement"). The Trust further alleges that Seldal's loan is specifically identified in the electronic "Schedule 1" that is referred to in the PNC Pool Supplement Agreement, and it points to a document in the record that, the Trust contends, is a redacted PDF printout of the PNC Schedule 1.[1] Then, in the second step of the transaction, the Trust alleges that the loans included in the PNC Pool Supplement Agreement were assigned to the Trust through the Deposit and Sale Agreement, and that a schedule attached to that agreement identified the pool of PNC loans that includes Seldal's loan.

¶9 Seldal stopped making payments on her loan in 2016. Following her default, the servicing of the loan was transferred to Transworld Systems, Inc. ("TSI"), which is the Trust's servicer for defaulted loans. After TSI exhausted its efforts to collect on the loan, the Trust commenced a collection action against Seldal.

¶10 In her answer, Seldal denied that her loan had been assigned to the Trust. She alleged that the Trust could not prove the assignment because it did not possess the contracts assigning the loan from PNC to NCF and then from NCF to

---

[1] Throughout her briefing, Seldal represents that the Trust does not have Schedule 1, and that it does not exist. She asserts, for example, that "a Pool Supplement was to list all of the loans allegedly transferred to [the Trust] on a Schedule ("Schedule1"), but there is no Schedule 1." She also asserts that "[t]he Schedule 1 provided by [the Trust] does not list a single loan." These assertions are misleading, given the affidavits and exhibits that have been made part of the record. At best, there is a disputed issue about the authenticity of the PDF printout of Schedule 1 that the Trust produced in discovery and filed with the circuit court.

the Trust, and because any evidence that the Trust has to prove these assignments would be inadmissible under the Wisconsin rules of evidence.

¶11 Seldal then counterclaimed against the Trust on behalf of a putative class of Wisconsin residents.[2] The class claims are aimed at the Trust's attempts to collect payments from a class of Wisconsin residents whose student loans originated with banks that include but are not limited to PNC. In other words, the class claims are not limited to those student loans included in the "Schedule 1" that is referenced in the PNC Pool Supplement Agreement. Seldal seeks a declaration that the Trust "lacks the right to enforce or to collect" on the loans that were taken out by members of the putative class. She also seeks damages on behalf of the putative class on the ground that, she alleges, the Trust violated the Wisconsin Consumer Act by attempting to collect on the loans, knowing that it did not have the legal right to do so.[3]

¶12 Around the same time that Seldal filed her counterclaims against the Trust, Seldal also filed a motion to certify a class, which would consist of "[a]ny Wisconsin resident whom [the Trust], directly, or indirectly through their authorized agent(s)[,] communicated with alleging that a debt was owed."[4] In her certification motion, Seldal argued that her claims for declaratory and monetary relief were the same as those of the putative class members, and that all claims

---

[2] Because this lawsuit originated with the Trust's collection action, the circuit court filings designate Seldal as a "counter-plaintiff" and the Trust as a "counter-defendant."

[3] *See* WIS. STAT. § 427.101 (2021-22) et seq., commonly referred to as the Wisconsin Consumer Act. All references to the Wisconsin Statutes are to the 2021-22 version.

[4] Seldal also sought to certify a subclass of consumers, which would consist of "[a]ny member of the [general class] who paid [the Trust], directly or indirectly, any amounts in response to any communication that alleged they owed a debt."

hinge on one common predominant question: whether the Trust could produce admissible evidence proving that it had been assigned the class members' loans. She further argued that the Trust could not produce such evidence for a reason that was common to all class members—specifically, because the Trust relies on servicers to maintain its records, and because, Seldal alleged, neither TSI nor any other servicer could produce a copy of the electronic schedules that had purportedly been "attached" to the pool supplement agreements.

¶13     The Trust opposed Seldal's motion. It argued that Seldal's claims against the Trust were inappropriate for class-wide resolution because several key determinations would require individualized inquiries. According to the Trust, these inquires included whether the Trust does not in fact own the loans taken out by each consumer; and whether the Trust knew or should have known as much when it engaged in any collection activity on the loans. The Trust argued that, for each member of the putative class, a jury would need to consider the documents that comprise the loan's chain of title, testimony from third parties, and the conduct of each consumer, including whether the consumer made payments, whether the consumer disputed the debt, and whether there had already been an adjudication of the Trust's ownership of the loans at issue.

¶14     Following a hearing, the circuit court granted Seldal's certification motion. *See* WIS. STAT. § 803.08(3) and (11) (requiring a written class certification order). In its written order, the court concluded that Seldal had established the elements required by § 803.08(1) and (2)(c), which include commonality and predominance. Regarding commonality, the court determined that there was one question that was common to the class—whether the Trust "unlawfully attempt[ed] to collect on [the class members'] loans"—and that this common question could be answered "'in one stroke' by a factual inquiry into [the

6

Trust]'s beliefs and intent regarding the assignment of the class members' loans."
Regarding predominance, the court determined that the common issues regarding
the assignment of these loans would predominate, even if other documents might
be necessary to prove the class members' claims. The court appointed Seldal as
the class representative and Seldal's counsel as class counsel.

¶15    The Trust appealed the class certification order.[5] On appeal, we
concluded that the circuit court's order did not comport with WIS. STAT.
§ 803.08(11)(a) because the court did not provide reasoning and analysis to
support its findings regarding at least some of the statutory prerequisites for
certification. *See **National Collegiate Student Loan Trust 2007-4 v. Heather
Seldal** (**Seldal I**)*, No. 2022AP1044, unpublished slip op. (WI App Aug. 17, 2023).
More specifically, we concluded that the common question that the court
identified was "nothing more than a highly generalized description of a claim
under the Wisconsin Consumer Act." *Id.*, ¶42. And, based on the certification
order, we were not persuaded that the court had identified "a common contention
or theory" that could be "prov[en] with common evidence and which, if proven,
[might] resolve an issue central to the claims of all class members." *Id.*, ¶¶42-44.
Even so, we rejected the Trust's argument that it was necessarily entitled to an
order denying class certification as a matter of law. *Id.*, ¶¶46-51.

¶16    As a result, we reversed the class certification order and remanded to
the circuit court for further proceedings consistent with that opinion. Following

___

[5] WISCONSIN STAT. § 803.08 specifically addresses procedural requirements for class
actions filed in Wisconsin, and § 803.08(11)(b) provides that the court of appeals "shall hear an
appeal of an order granting or denying class action certification" provided that "a notice of appeal
is filed within 14 days after entry of the order."

the remand, the case was assigned to a different circuit court judge, who ordered supplemental briefing on the certification issue.

¶17 In the supplemental briefing that Seldal filed with the circuit court, she again argued that the common and predominant issue was "whether the Trust lacks the right to collect on the class members' loans." And she again argued that that question turned on "whether the [Trust] can prove ownership of the putative class member[s'] loans." According to Seldal, there would be a common answer to that question because all of the loans were originated by the same processor (TERI), were assigned from NCF to the Trust through a single Deposit and Sale Agreement, and were subject to the same recordkeeping practices by the Trust's servicers. She summarized her argument in favor of commonality as follows: "If [the Trust] can prove it was properly assigned the loans and owns the loans, then [it] will prevail," and "[i]f it cannot prove this, then its claim to ownership of all the loans fail."

¶18 Following a hearing, the circuit court denied the certification motion. In its order, the court resolved the parties' dispute over which party would bear the burden of proof on the class claims because, it concluded, the resolution would be "determinative." As discussed in more detail below, the court concluded that, to prevail on her class claims for declaratory relief and damages under the Wisconsin Consumer Act, Seldal would have the burden to prove that the putative class members' loans had not been assigned to the Trust. Yet, as the court explained, Seldal's arguments for certification instead focused on whether the Trust had admissible evidence that it could use to prove the assignment. In so arguing, the court determined, Seldal was improperly attempting to shift her burden of proof to the Trust. The court acknowledged that Seldal's "evidentiary objection" to the admissibility of certain documents might carry the day in the collections action, in

which the Trust would have the burden to prove the validity of the assignment. However, the court concluded, her evidentiary objection would not be enough to satisfy the burden she would carry on the class claims, which would be to show that "the Trust did not have an assignment (and knew it) and thus should be subject to a class-action lawsuit."

¶19     Seldal appeals.[6]

## DISCUSSION

¶20     As we noted in *Seldal I*, the Wisconsin requirements for class certification are codified in WIS. STAT. § 803.08.  That statute has recently been revised to harmonize Wisconsin law with federal standards, *see* S. CT. ORDER 17-03 (eff. July 1, 2018); 2017 Wis. Act 235, and our supreme court has directed us to look to federal case law applying Rule 23 of the Federal Rules of Civil Procedure when interpreting our state class action statute, ***Harwood v. Wheaton Franciscan Services, Inc.***, 2019 WI App 53, ¶21, 388 Wis. 2d 546, 933 N.W.2d 654.

¶21     The substantive standards for certifying a class are found in WIS. STAT. § 803.08(1) and (2).   Subsection (1) requires the party requesting certification to establish, by a preponderance of the evidence, several prerequisites

---

[6] Seldal's briefs fail to comply with WIS. STAT. RULE 809.19(8)(bm), which addresses the pagination of appellate briefs.  *See* RULE 809.19(8)(bm) (providing that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover").  This rule was amended in 2021, *see* S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021), and the reason for the amendment is that briefs are now electronically filed in PDF format, and are electronically stamped with page numbers when they are accepted for efiling.  As our supreme court explained when it amended the rule, the new pagination requirements ensure that the numbers on each page of a brief "will match … the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of a brief.  S. CT. ORDER 20-07 cmt. at xl.

about the proposed class and class representative (referred to as "numerosity," "commonality," "typicality," and "adequacy"). *See Harwood*, 388 Wis. 2d 546, ¶23 (citing § 803.08(1)); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (commonly referred to as *Dukes*); *see also Fotusky v. ProHealth Care, Inc.*, 2023 WI App 19, ¶11, 407 Wis. 2d 554, 991 N.W.2d 502 (explaining that the burden of proof is a preponderance of the evidence). If the party requesting certification satisfies its burden on those prerequisites, that party must also prove that the putative class action conforms to one of the class actions enumerated in § 803.08(2). As relevant here, the party must prove "that the questions of law or fact common to all class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* § 803.08(2)(c). These two additional prerequisites are referred to as "predominancy" and "superiority." *Harwood*, 388 Wis. 2d 546, ¶24.

¶22 The issues in this and the prior appeal turn on commonality and, to some extent, on predominancy. As was observed in *Dukes*, the statutory language requiring "questions of law or fact common to the class" is "easy to misread, since 'any competently crafted class complaint literally raises common questions.'" *Dukes*, 564 U.S. at 349 (citation and brackets omitted). Thus, the raising of common questions alone does not suffice, *see id.*, nor does the mere fact that all of the class members have allegedly experienced a violation of the same provision of law, *see id.* at 350.

¶23 The focus of the commonality inquiry instead turns on whether, as a result of the common questions, there is "cause to believe that all class members' claims can be productively litigated at once." *Harwood*, 388 Wis. 2d 546, ¶25 (citing *Dukes*, 564 U.S. at 350) (brackets removed). For a class's claims to be

productively litigated at once, they "must depend upon a common contention … that is capable of class[-]wide resolution." *See Dukes*, 564 U.S. at 350; *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015). A common contention is capable of class-wide resolution if it can be proven or disproven with common evidence, and a determination of its truth or falsity will resolve an issue that is central to the validity of each class member's claims. *See Harwood*, 388 Wis. 2d 546, ¶25 (citing *Dukes*, 564 U.S. at 350). Even if there are common questions of law or fact that satisfy this standard, certification will not be warranted if the common questions will not predominate over the questions that affect individual members.

¶24 The decision to grant or deny a motion for class certification is committed to the circuit court's discretion. *Id.*, ¶¶5, 41; *Hammetter v. Verisma Sys., Inc.*, 2021 WI App 53, ¶9, 399 Wis. 2d 211, 963 N.W.2d 874. A court properly "exercises its discretion when it considers the facts of record and reasons its way to a rational, legally sound conclusion." *Shannon v. Mayo Clinic Health Sys. – Nw. Wis. Region, Inc.*, 2021 WI App 49, ¶12, 398 Wis. 2d 685, 963 N.W.2d 115 (citing *Harwood*, 388 Wis. 2d 546, ¶41).

¶25 Here, the circuit court denied Seldal's motion for class certification because, it determined, Seldal failed to identify a "common contention … that is capable of class[-]wide resolution," such that a "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the [class] claims in one stroke." *See Dukes*, 564 U.S. at 350. In particular, the court determined that Seldal's arguments about commonality improperly attempted to shift Seldal's burden of proof on the class claims to the Trust. According to Seldal, the common contention is that the Trust will be unable to produce admissible evidence to prove that it had been assigned the class members' loans.

Yet, the circuit court explained that Seldal's burden on the class claims is to show that the Trust does not own the loans, and Seldal fails to point to any evidence that would apply to the class as a whole and could satisfy that burden. Seldal entirely fails to engage with this reasoning on appeal, and by failing to engage, she fails to demonstrate that the court erroneously exercised its discretion. *See Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994) (an appellant impliedly concedes that a circuit court did not err when the appellant "ignores the ground upon which the … court ruled and raises issues on appeal that do not undertake to refute the … court's ruling").[7]

¶26 Even if we were to overlook Seldal's failure to address the circuit court's reasons for denying the class certification motion, we would conclude that the court considered the facts of record and reached a rational and legally sound conclusion. *See Shannon*, 398 Wis. 2d 685, ¶12. As we now explain, our conclusion that the circuit court correctly determined that Seldal's arguments shift the burden of proof is supported by consideration of the evidence that has been produced in discovery and the specific nature of the parties' dispute.

¶27 As noted, Seldal's loan was purportedly bundled with loans taken out by other PNC borrowers, which were purportedly assigned to NCF through the PNC Pool Supplement Agreement and its electronic Schedule 1. That agreement was then one of 18 pool supplements that were purportedly assigned to the Trust.

---

[7] Indeed, rather than engaging with the circuit court's reasoning, Seldal doubles down on her framing of the common contention, without acknowledging that the court found that framing to impermissibly shift the burden of proof from Seldal to the Trust. For example, in her opening appellate brief, she argues that the common contention is "whether [the Trust] can prove that it is an assignee of [the] credit agreements," and that the Trust's "burden to prove its claims against Seldal is the same as for any of the class members."

The Trust has produced documents that, it contends, are the PNC Pool Supplement Agreement and a PDF printout of the electronic Schedule 1, as well as a copy of the Deposit and Sale Agreement that purportedly assigned the 18 pools to the Trust. In other words, the Trust contends that it possesses the documents by which it was properly assigned the loans, and it has produced those documents in this litigation and filed them with the circuit court.

¶28 In response, Seldal contends that these documents are not admissible because, she argues, the Trust cannot authenticate them and cannot provide the testimony of someone with personal knowledge of how they were created and maintained. For purposes of evaluating Seldal's argument, we will assume without deciding that her evidentiary objections to Schedule 1 would be sustained—although this is no small assumption in Seldal's favor. But even with that assumption, it would, at most, mean that the putative class members would have *a common defense* to any collections actions that the Trust attempted to bring against them. Yet, Seldal is not seeking to certify a class of persons who would be able to successfully defend against collections actions that the Trust might bring against them. She is instead seeking to certify a class of persons who have affirmative claims against the Trust. To satisfy her burden of proof on those claims, Seldal would have to do more than show that the class members will or might prevail in any collections actions that the Trust could bring against them. At a trial on her class claims, she would bear the burden to prove that the loans were not actually assigned to the Trust, which requires more than pointing out problems with the admissibility of any evidence that the Trust might offer on that issue. *See Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶30, 290 Wis. 2d 514, 714 N.W.2d 155 (the burden of proving that a contract is invalid rests with the party making the claim).

¶29    To illustrate this point, consider a hypothetical that focuses exclusively on Seldal's loan, and that highlights the distinction between the Trust's burden of proof in its collections action and Seldal's burden to prove the counterclaims she raises against the Trust.  For the sake of this hypothetical, assume that Seldal took out a loan from PNC, PNC entered into a written contract assigning the loan to NCF, and NCF entered into a written contract assigning it to the Trust.  However, after the loan was properly assigned to the Trust, the assignment contracts were destroyed in a fire.  Under those circumstances, the Trust would not succeed in a collection action against Seldal if it lacked other admissible proof of the assignments.  Yet, the Trust's inability to produce the assignment contracts would not, in and of itself, mean that Seldal is entitled to a declaration that her loan was not assigned to the Trust.  Nor would it mean that Seldal would be entitled to damages if the Trust attempted to collect on the loan.

¶30    In making this basic point about burdens of proof, the circuit court cited *Gwiazda v. LVNV Funding, LLC*, No. CV 22-00698, 2022 WL 4280478, *4 (E.D. Pa. Sept. 15, 2022), *aff'd*, No.22-3295, 2023 WL 8595402 (3d Cir. Dec. 12, 2023), which it found to be persuasive.  In *Gwiazda*, there had been a prior lawsuit to collect on Gwiazda's credit card debt, which the court had dismissed because the debt collections agency that filed the lawsuit lacked admissible evidence to establish a chain of assignments of the debt.  *Id.* at **1-2.  However, the agency's inability to prevail in the collections lawsuit did not, in and of itself, mean that Gwiazda had a viable claim against the agency for making false or misleading statements in an attempt to collect a debt.  *Id.* at **3-4.  As the *Gwiazda* court explained, Gwiazda's argument to the contrary "falsely equate[d] the [collection court's] finding that [the agency] failed to submit sufficient evidence to prove that it was the assignee of the [a]ccount with an affirmative finding that [the agency]

14

was not the assignee of the [a]ccount." ***Id.*** at *4. Yet, "[w]hile the [collection court] held that [the agency] failed to present a chain of assignment that proved it was the assignee of the [a]ccount, it made no determination as to whether or not [the agency] actually was or was not the assignee of the [a]ccount." ***Id.*** Thus, Gwiazda failed to provide any evidence on an essential element that was necessary to sustain her claim against the agency. ***Id.***

¶31 Seldal does not cite ***Gwiazda*** in her appellate briefing, much less attempt to distinguish that case or demonstrate how its reasoning is inapplicable or incorrect. Indeed, as mentioned, despite the number of arguments she advances in her appellate brief, none grapple with the central conclusion that the circuit court made—that Seldal's arguments improperly attempt to shift the burden of proof to the Trust.[8]

¶32 Rather than addressing the circuit court's discussion of the burden of proof, Seldal misstates the circuit court's rationale for denying the certification motion. To that end, Seldal cites ***Amgen Inc. v. Connecticut Retirement Plans & Trust Funds***, 568 U.S. 455, 466 (2013), and she asserts that the circuit court denied her motion because it erroneously required her to prove that she would prevail on the merits of the class claims as a prerequisite to certification. This

---

[8] In addition to its analysis of the burden of proof, the circuit court also offered a second reason for denying the certification. It stated that, "[e]ven assuming, *arguendo*, that Seldal's evidentiary objection constitutes some sort of evidence [that could satisfy her burden of proof], … there are too many different questions of authenticity which would arise," and "individualized inquiries [would be] necessary to determine the assignment of each class member['s] loan." The court had a fair point—the dispute Seldal raises is over the authenticity of Schedule 1 to the PNC Pool Supplement Agreement, but the PNC affidavit and documents that the Trust has offered to prove the authenticity of the PNC Schedule 1 would have no bearing on whether the loans in the 17 other pool supplements were validly assigned. Yet, we need not address this issue further because, as discussed, Seldal has not shown that the first reason that the court gave for denying certification was clearly erroneous.

15

misconstrues the court's words and its analysis—the court did not require her to *prove* the class claims as a prerequisite. Instead, as discussed above, the court considered whether Seldal had identified a "common contention," the "truth or falsity" of which would "resolve an issue that is central to the validity of each one of the [class] claims in one stroke." *See Dukes*, 564 U.S. at 350. Because the court determined that the common contention that Seldal identified—that the Trust did not have admissible evidence of the assignments—would not satisfy her burden of proof on the class claims, it followed that resolution of that contention would not resolve an issue that was central to the class claims "in one stroke."

¶33 Finally, Seldal cites two enforcement actions in which the federal Consumer Financial Protection Bureau and the State of New York entered into consent decrees with the Trust's default loan servicer, TSI. In both actions, the enforcement authority took issue with TSI for filing false pleadings and affidavits in collections lawsuits that TSI initiated against borrowers who had defaulted.[9] There are at least two problems with Seldal's reliance on these enforcement actions to bolster her case for certification. First, the class that Seldal asked the circuit court to certify is not limited to those Wisconsin consumers that the Trust or TSI initiated a collections action against, or even those Wisconsin consumers who had defaulted on their loans. Second, whether affiants in other collections

---

[9] For example, in the "Assurance of Discontinuance" document signed by the New York Attorney General and TSI, the State of New York took issue with TSI for litigation activities including: filing collections complaints that falsely listed one of the national collegiate student loan trusts as the "original creditor"; filing sworn affidavits that misrepresented newly created excerpts of student loan schedules as the original schedules; submitting signed affidavits that falsely swore to the affiant's personal knowledge of business records; and submitting affidavits that conclusively stated that a loan had been transferred to one of the trusts without submitting documentation that conclusively established the link between the loan and the trust. The Consumer Financial Protection Bureau made similar findings and conclusions in a consent order that can be found at 2017 CFPBCO 0018 (2017), 2017 WL 7520640.

cases falsely claimed personal knowledge of documents has no bearing on whether there is some uniform flaw or reason common to the putative class members that the Trust was not validly assigned any of their loans.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.